UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TOTAL ENVIRONMENTAL
CONCEPTS, INC.**

      **Plaintiff,**

  v.

      Case No. 2:20-cv-3992
      Judge Edmund A. Sargus, Jr.
      Magistrate Judge Kimberly A. Jolson

**FEDERAL INSURANCE COMPANY.,**

      **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant Federal Insurance Company's ("Federal") Motion for Summary Judgment (ECF No. 26) and Defendant's Motion to Strike (ECF No. 28). For the reasons set forth below, the Court **DENIES** both motions.

**I. Background**

Plaintiff Total Environmental Concepts, Inc. ("TEC") is a subcontractor that had an agreement with Brican, Inc., ("Brican") a general contractor, to install a fuel tank system at the Department of Veteran Affairs (the "VA") in Columbus, Ohio. (Affidavit of Michael Belanger, ECF No. 26-1, at ¶¶ 1, 3.) Brican, as required under federal law, acquired a performance and payment bond through Defendant, Federal Insurance Company ("Federal"). (*Id.* ¶ 4.) This matter arises from TEC's Miller Act, 40 U.S.C. § 3131 *et seq.*, claim to receive compensation for allegedly completed but unpaid work.

Brican and TEC entered into an agreement (the "Subcontract") on March 16, 2017, to install a fuel tank system for $504,100. (*Id.* ¶¶ 3, 5.) The Subcontract outlined the work TEC was

1

to perform for Brican, along with inclusions and exclusions. (*See* Subcontract, §A.4, ECF No. 1-2.) "Earth support, dewatering, rock excavation, site [sic]" is listed as an exclusion. (*Id.*) The Subcontract also included an "Incorporation of Principle Contract" clause that bound TEC to the terms and conditions outlined in the contract between Brican and the VA ("Principal Contract"). (*Id.*, ¶ A.3.) The subcontract also contained a Choice-of-Law provision, which requires that the laws of Massachusetts govern any questions arising from the Subcontract. (*Id.*, ¶ 23.)

Sometime before April 2018, Brican discovered subsurface groundwater underneath the jobsite. (Belanger Aff. ¶ 10.) On April 17, 2018, Brican and TEC executed a "change work" order ("Change Order") that required TEC to complete the following additional work: (Belanger Aff., ¶ 8.)

- Shoring[1] - $89,400
- Dewater[2] and Stabilize- $23,755 (to be credited if not required)
- Ballast Tanks[3] - $9,945 (to be credited if not required) (Change Order, ECF No. 1-1.)

TEC alleges that it completed the additional work but did not receive payment for it. (Affidavit of Ted Bedell, ECF No. 27-1, at ¶¶ 14–16.) On August 6, 2020, TEC brought a Miller Act claim against Federal, seeking $110,000, the amount owed for the work in the Change Order. Federal paid for the shoring work but maintains that it does not owe the remaining $35,442.36 because TEC was not required to and did not complete the work. (Belanger Aff. ¶ 12-14.)

On October 22, 2021, Federal filed a motion for summary judgment. On November 19, 2021, TEC submitted a Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 27) and included the Affidavit of TEC President, Ted Bedell (ECF No. 27-1).

---

[1] Shoring is installing temporary supports, called shores, in an excavated hole to keep it from collapsing.
[2] Dewatering is the process of removing surface or ground water from a worksite.
[3] Ballast is adding liquid weight to a tank to keep it from floating. The liquid is called ballast.

**II. Defendant's Motion to Strike Affidavit of Ted Bedell**

Federal moves to strike Mr. Bedell's affidavit asserting that it is not based on personal knowledge. (Def.'s Mot. to Strike, at 1.) Alternatively, Federal asks this Court to strike statements that are not based on personal knowledge and statement that constitute improper legal conclusions. (*Id.*, at 2.)

**A. Personal Knowledge**

Under Federal Rule of Civil Procedure 56, all affidavits or declarations used to "support or oppose a motion [for summary judgment] must be made on personal knowledge." Fed. R. Civ. P. 56(c)(4). Federal Rule of Evidence 602 requires that sufficient evidence must be introduced to support a finding that the witness has personal knowledge of the matter.

The threshold of Rule 602 is low. *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990). As the United States Court of Appeals for the Sixth Circuit has indicated, "corporate officers are considered to have personal knowledge of the acts of their corporations." *Fambrough v. Wal-Mart*, 611 Fed.Appx. 322, 330 (6th Cir. 2015); *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F.Supp.2d 948, (S.D. Ohio, 2000) This principle, however, only applies to corporate officers – not employees or managers. *Fambrough v. Wal-Mart*, 611 Fed.Appx. 322, 330 (6th Cir. 2015).

The record reflects that Ted Bedell was the founder, "[p]resident and [p]rincipal in charge of construction projects during the relevant time period at TEC." (Bedell Aff. ¶ 3.) Undoubtedly, this rendered him a TEC corporate officer when the parties executed the contract and when TEC performed the work. Thus, the affidavit satisfies Rules 56's personal knowledge requirement.

### B. Conclusions of Law

Federal also contends that ¶¶ 10, 11, and 17 in Ted Bedell's affidavit are impermissible legal conclusions, because Mr. Bedell attempts to interpret the Subcontract. Under Ohio law, interpretation of a written contract is a matter of law and for the initial determination of the court. *Lemley v. Ford Motor Co.*, 36 F.3d 1097 (6th Circ. 1994). "Courts should disregard conclusions of law (or 'ultimate fact') found in affidavits" submitted for summary judgment. *Cincinnati Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 377 F.Supp.3d 859, 864 (S.D. Ohio 2019) (citing *Harrah's Entm't, Inc. v. Ace Am. Ins. Co.*, 100 F.App'x, 387, 394 (6th Cir. 2004)).

The Court finds that some of Mr. Bedell's statements regarding the contract may offer impermissible legal conclusions – for example, his statement that "Brican was solely responsible for dewatering." (Bedell Aff. ¶ 11.) This is a matter for this Court to decide, not him. Nevertheless, the Court sees little reason to strike these statements in their entirety. Instead, it simply gives their legal import no weight. *Cincinnati Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 377 F.Supp.3d 859, 864 (S.D. Ohio 2019) (not striking statements of legal conclusion but considering whether the statements possess any value in the summary judgment context) (citing *Ortiz v. Anchor Realty Const., Inc.*, 2011 WL 2441918, at *4 (S.D. Ohio June 14, 2011)). In other words, the Court will disregard the statements but will not strike any portion of Mr. Bedell's affidavit.

### III. Defendant's Motion for Summary Judgment

### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party

4

who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotations omitted). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477, U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in its favor. Id. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-159 (1970).) A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 48.

### B. Miller Act

The Miller Act requires a contractor of a federal building construction project exceeding $100,000 to furnish a payment bond "for the protection of all persons supplying labor and material in carrying out the work." 40 U.S.C. § 3131(b)(2). Ordinarily, if a general contractor defaults on payment, a subcontractor can secure a mechanic's lien against private property. *F.D. Rich Co. Inc. v. United States ex rel. Indus. Lumber Co.*, 94 S.Ct. 2157, 2160 (1974). However, "a lien cannot attach to government property, thus the Miller Act was intended to provide an alternative remedy to protect" the rights of subcontractors and suppliers. *Id.*

5

To prevail on a Miller Act claim, the subcontractor must prove that it (1) supplied materials or work in connection with the subcontract agreement, (2) did not receive payment, (3) had a good faith belief that the materials were necessary for the specified work, and (4) has a claim that satisfies the jurisdictional requisites. *United States ex rel. Spectrum Control Sys., Inc. v. Staffco Constr. Inc.*, 107 Fed.Appx. 453, 457 (6th Circ. 2004). Courts generally interpret the Miller Act liberally to effectuate its purpose of protecting subcontractors. *United States ex rel. Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.*, 750 F2d 759, 761 (9th Cir. 1984); (*see also United States ex rel. American Civil Construction v. Hirani Engineering & Land Surveying*, 26 F4th 952, 956 (D.C. Circ. 2022) (upholding the district court's denial of summary judgment because of genuine issues of material fact and remanding to district court for additional factfinding). To that end, they are usually skeptical of general incorporation clauses of principal contract clauses for certain matters, specifically, arbitration and wage provisions. See *J.S. & H. Constr. Co. v. Richmond County Hosp, Auth.*, 473 F.2d 212 (5th Cir. 1973); *United States ex rel. Ken's Carpets Unlimited v. Interstate Landscaping Co.,* 1994 WL 481684 (6th Cir. Sep. 6, 1994). Courts agree that a general incorporation of the terms of the principal contract typically refers specifically to the "quality and manner of the subcontractor's work." *United States ex rel. Richardson v. Mack Mech., In.*, No 2:12-CV-00109, 2017 WL 1175660, at *4 (M.D. Tenn. Mar. 30, 2017); *United States ex rel. T/N Plumbing & Heating Co. v. Fryd Const. Corp.*, 423 F.2d 980 (5th Cir. 1970). Here, the parties dispute whether certain work was included by general incorporation of the principal contract.

### C. Contract Interpretation

When federal courts are asked to interpret a contract in a diversity action, they "will generally enforce the parties' contractual choice of governing law," provided it is

6

enforceable. *Express Packaging of OH, Inc. v. Am. States Ins. Co.*, 800 F.Supp.2d 886, 890 (N.D. Ohio 2011) (citing *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)). Here, neither party disputes the basic validity or enforceability of the Subcontract's Choice-of-Law Provision. (ECF No. 27, Page 6) (ECF No. 26). Accordingly, the Court will apply Massachusetts's substantive law to resolve the parties' dispute. *See Savedoff*, 524 F.3d at 762.

In Massachusetts, "(t)he interpretation of a contract is a question of law for the court." *Eigerman v. Putnam Invs.*, 450 Mass 281, 287 (2007). Where a contract is free from ambiguity, the court interprets it "according to its plain meaning." *Southern Union Co. v. Dept. of Pub. Utils.*, 458 Mass 812, 820 (2011). Interpretation of a written instrument must be guided by "justice, common sense, and the probable intention of the parties." *Stop & Shop, Inc. v. Ganem*, 347 Mass. 697, 701 (1964).

**D. Analysis**

Federal moves for summary judgment on the grounds that TEC did not perform the work outlined in the Change Order and, thus, has failed to prove the first element of its Miller Act claim. (ECF No. 26) Federal maintains that the work at issue – dewatering and ballast – was contingent on the presence of extraordinary groundwater at the jobsite. (Belanger Aff. ¶ 13.) But according to numerous documents offered by Federal, the jobsite, was in fact, dry. (*See* Belanger Aff. Ex. B, C, L, M, (Photographs of the Excavation Site); ex. F (Tank Installation Checklist); ex. H (Columbus Fire Division Inspection Report); ex. I (Email from TEC's Operations Manager.) To that extent, Federal argues that any dewatering or ballast work TEC performed was not required. Alternatively, Federal argues that the work TEC completed was already required by the Principal Contract, which required TEC keep the worksite dry and follow the tank manufacturer's installation instructions. (Belanger Aff. ¶¶ 18, 21.)

TEC responds that the excavation site was not dry, that it completed the work, and that it even incurred additional costs from doing so. (Bedell Aff. ¶¶ 9, 14-16.) In support, TEC points to an email from Brican's President stating that there was water at the excavation site, meaning the work was necessary. (*See* Bedell Aff. Ex. B.) TEC also maintains that dewatering and ballast were not included in the subcontract – otherwise, it argues, there would have been no need for the Change Order. (Pl.'s Resp. to Def.'s Mot. for Summ. Jud.)

The question before the Court is whether there are genuine issues of material fact that (1) the work was necessary and (2) TEC completed the work. Both parties agree that TEC completed **some** dewatering and ballast. They disagree whether the work was included in the Subcontract or added by the Change Order. If it was included in the Subcontract, then TEC is not entitled to any additional payment. (Belanger Aff. ¶ 18, 21.) However, if it was excluded in the Subcontract and then added on by the Change Order, Federal owes TEC for completing the work. The Court will analyze the Subcontract to establish if there are any genuine issues of material fact. Using the Massachusetts standard of contract interpretation and the federal standard for Miller Act claims, the Court will address each line-item of the Change Order separately.

   1. Dewatering

Federal asserts that the "Incorporation of the Principal Contract" clause (*see* Subcontract, A.3) required TEC to dewater and keep the jobsite dry. (*See* Belanger Aff. Ex. D (Principal Contract, Section 231000 – Facility Fuel Systems, page 20); Ex. G (Principal Contract, Section 312000 – Earthwork, page 11).) Thus, in their view, any dewatering completed by TEC was already required – and therefore – not reimbursable under the Change Order. (Belanger Aff. ¶ 21.)

8

However, the "Incorporation of Principal Contract" clause states that TEC is bound by the Principal Contract's conditions "… insofar as they are applicable … unless any terms or conditions [are] substituted or added by this agreement, in which the conditions herein shall apply." But, as noted, the Subcontract excluded "dewatering" work. And in TEC's view, this means it was not bound by the Principal Contract's dewatering provision when it entered into the Subcontract.

First, the Court must look at the plain meaning of the contract. On its face, the Subcontract does not specify what kind of dewatering was excluded. (*See* Subcontract A.4, Exclusions.) Thus, "dewatering" is ambiguous in the contract and the Court must next look at the parties' intent. Federal argues that the Subcontract only excludes *subsurface groundwater* dewatering, while the Principal Contract still requires TEC to remove *surface water*. But the Subcontract makes no such distinction. And Federal fails to offer any persuasive evidence that both parties intended the term "dewatering" to merely apply to groundwater in the Subcontract. TEC maintains that the Subcontract excluded all dewatering and the work was only added on by the Change Order, for which it deserves to be paid. The intent of the parties is unclear and a genuine issue of material fact.

Reading the Subcontract in the light most favorable to the non-movant, TEC has a more than colorable argument that the Subcontract excluded the dewatering work that is now at issue. Work which, according to TEC, Brican later required TEC to perform in the Change Order. There remains a genuine issue of material fact that precludes summary judgment, that being what kind of dewatering the parties intended to exclude when entering into the Subcontract.

### 2. Ballast

Federal maintains the "Incorporation of the Principal Contract" clause required TEC to follow tank manufacturer's instructions when installing the fuel tanks, a task generally required for the installer to perform. (Belanger Aff. ¶ 19.) According to the tank manufacturer's instructions, different ballast work is required depending on the groundwater conditions during installation. (*See* Belanger Aff. Ex. E, page 20, 21.) Both parties agree that TEC completed some ballast work. Thus, this issue hinges on whether the jobsite was wet or dry. If it was dry, then TEC completed routine ballast as per the tank manufacturer's instructions and is not due any additional payment. If it was wet, then TEC completed the additional work in the Change Order and must be paid.

Federal provides a large amount of evidence that the jobsite was dry. (*See* Belanger Aff. Ex. B, C, L, M, (Photographs of the Excavation Site); Ex. F (Tank Installation Checklist); Ex. H (Columbus Fire Division Inspection Report); Ex. I (Email from TEC's Operations Manager.) For example, the completed installation checklist confirms that the jobsite was dry, *and* TEC ballasted the tanks according to the manufacturer's instructions. (*See* Belanger Aff. Ex. F, Questions 5, 10.) However, TEC provides an email from Brican's President stating that there was groundwater at more shallow depths than originally expected, possibly meaning that the jobsite was wet, and that TEC performed a wet-hole installation. (*See* Bedell Aff. Ex. B.) Furthermore, this shows the general contractor admits TEC performed the Change Order work.

The Subcontract does not reference ballast work. It does, however, require TEC to follow plans and specifications when completing the work. (*See* Subcontrct, A.4, "Description of Work.") The "Incorporation of Principal Contract" clause also incorporates Brican's obligation to "apply and install materials, equipment and specialties in accordance with manufacturer's

10

written instructions." (Belanger Aff. Ex. D, 1.3(B).) Because general incorporation of the terms of the principal contract refers to the "quality and manner of the subcontractor's work," the Court holds that TEC was obligated to follow tank manufacturer's instructions to install the fuel tanks. *Richardson*, 2017 WL 1175660, at *4. Thus, this is not an issue regarding contract interpretation for the Court.

The Court must read the evidence in light most favorable to the non-movant. Although Federal provides proof that the jobsite was dry, TEC has an email in which the President of Brican admits to potential wet jobsite conditions. It is not for the Court to weigh the strength of this contradictory evidence. Whether the jobsite was dry or wet is a genuine issue of material fact and is best left for a jury to decide.

### IV. Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Strike and Motion for Summary Judgment (ECF Nos. 26, 28). This case is to remain open.


**IT IS SO ORDERED.**


**4/4/2023**                                       **s/Edmund A. Sargus, Jr.**
**DATE**                                            **EDMUND A. SARGUS, JR.**
                                                    **UNITED STATES DISTRICT JUDGE**